Argued September 17, reversed October 30, 1959
# MOELLER ET UX *v.* MULTNOMAH COUNTY
### 345 P. 2d 813

*David Robinson, Jr.,* Deputy District Attorney for Multnomah County, argued the cause for appellant. With him on the brief were Leo Smith, District Attorney, and Willis A. West, Deputy District Attorney, all of Portland.

*John R. Sabin,* Portland, argued the cause for respondents. With him on the brief were Mautz, Souther, Spaulding, Denecke & Kinsey, Portland.

Before McALLISTER, Chief Justice, and WARNER, SLOAN and KING, Justices.

KING, J.   (Pro Tempore)

This is an action for damages brought by George H. Moeller and Bernice E. Moeller, husband and wife, against Multnomah County, a political subdivision of the State of Oregon, for damages to their property by blasting operations conducted by the county at their rock quarry at Rocky Butte. The action is under the theory that there was a "taking" of their property by the county by inverse condemnation.

From a jury verdict and judgment in favor of the plaintiffs in the amount of $2,500, the defendant county appeals to this court.

The principal question for determination in this

case is: Does damage to plaintiffs' property resulting from jars and concussion from blastings, causing some damage but not causing loss of occupancy, amount to a "taking" under Article I, § 18, Oregon Constitution, by inverse condemnation.

Multnomah County was at the time complained of, and had been since about 1940, operating a rock quarry at a site known as Rocky Butte where county prisoners, under the direction of the county roadmaster, engaged in quarrying and crushing rock for use on the county roads.

The plaintiffs-respondents, Mr. and Mrs. Moeller, resided on property located at 2765 Northeast 102nd Avenue, Portland. They had purchased the property in April, 1952. Their home was located from 900 to 1500 feet from the appellant's blasting operations, depending on what part of the quarry the particular blasting took place. The Moellers had never lived in Portland prior to purchasing the property. They claim that they were not familiar with the surrounding country and did not know of the blasting operations in the close vicinity to their property. They moved into their home in July, 1952. Before purchasing the property they looked over the house and premises and saw no cracks in the walls or other conditions that would indicate to them that any damage had been done up to that time.

Shortly after they moved into the property they heard and felt the blasting carried on at the rock quarry in varying intensity, sometimes mild, sometimes strong enough to shake decorative knick-knacks off the shelves and knock pictures off the walls. The feeling was somewhat similar to being in an earthquake tremor. Shortly after the larger tremors or concussions, cracks were noticed in the concrete of the

basement and patio floors and in the walls and ceilings of some rooms. On one occasion the top of the brick chimney in the patio was knocked or shaken off. There was damage to the cesspool which catches the water from wash basins and the eaves, and this caused some water to back up into the basement of the house. Various other substantial items of damage were testified to, and the costs of repairs and estimation of repairs were substantial.

The exact times or dates of the damaging blasts were rather indefinite, but plaintiffs had kept notes of some exact dates and times, and in their testimony claim that substantial damage was done during the period alleged in the complaint.

The evidence did not show that any rocks or debris were thrown onto plaintiffs' property, and the damage was confined to concussion-caused damage, other than Mrs. Moeller's testimony as to dust, as follows:

"A * * * and there would be this dust. You couldn't actually see it in the air but when I was using my everyday dishes I wouldn't have to wipe it off, but dishes I would use for guests, on top of every stack of plates would be just like grit."

Mr. Moeller, on redirect examination, testified regarding dust as follows:

"Q Do you notice anything like dust or anything like that in the atmosphere when these blasts occur?

"A Yes, when they blast on the hill and the wind is in a westerly direction it blows this grit over there and unless we get up and shut our windows quickly it gets in our house and the closets and our dishes and everything gets covered with it.

"Q What is it? Is it just a dust?

"A It is like a — it is fine dirt that the wind

carries right over. It makes a terrific cloud when they set off a big blast—there's a terrific cloud of that and if the wind is just right it will bring it right over and it will come into your house.

"Q Has this dust come into your house on numerous occasions?

"A Yes."

This is substantially the evidence the plaintiffs relied on, except, of course, testimony as to the alleged monetary value of the damage done.

The defendant offered evidence to show that Mr. and Mrs. P. J. Baumer, who sold the property to the plaintiffs in April, 1952, had suffered some damage from cracked walls, ceilings and floors, and were paid for it by the defendant shortly before the Moellers purchased the property. Defendant also offered testimony to the effect that the amount of powder used in the blasts, and that the strength and intensity thereof, had been greatly reduced since April, 1952. Originally, under WPA as high as twenty-one tons per charge were used. About 1951, while the Baumers owned the property, a couple of blasts of ten tons were used, then seven tons, then four tons, and, finally, the shots were limited to 1000 pounds, and if over 500 pounds, the sheriff was to be notified first.

Mr. Oswald N. Day, who supervised the blasting, in addition to testifying as above summarized, testified:

"A The only time we used over 500 pounds of powder after April, 1952 was, I believe, in February in 1954. We decided that we would hire a seismologist and get a seismograph up there and take recordings as to vibration to see the amount of powder we could use without doing any damage up there. And two tests were made in February

of 1954. The maximum amount of powder used in those tests was 800 pounds."

Defendant's Exhibit 3 is a record of all blasts since December 17, 1953.

■ The first complaint in this case was a claim for damages against the county as a tort action. Demurrer was sustained to this complaint. The amended complaint, which is now before us, was then filed and again asked for damages upon the theory of an alleged taking of plaintiffs' property under inverse condemnation. This amended complaint alleges:

"I.

"That plaintiffs are and at all times herein mentioned were husband and wife and the owners of certain land with a dwelling house situated thereon located at 2765 N. E. 102nd Avenue, Portland, Multnomah County, Oregon, and more particularly described as follows:

"Commencing at the common corner to Sections 27, 28 21 and 22, Township 1 North, Range 2 East of the Willamette Meridian; thence South along the line between said Sections 27 and 28, 2060.7 feet; thence West 30 feet to a point on the West side line of N. E. 102nd Avenue, formerly Craig Road, the true point of beginning of land to be described; thence South along the West line of the said N. E. 102nd Avenue 120 feet; thence West 471.5 feet more or less, to the Easterly boundary line of the right of way of the Oregon Railway and Navigation Co.; thence Northerly along the said right of way line to a point West of true place of beginning; thence East 465.5 feet to the true point of beginning, in the County of Multnomah and State of Oregon, except Westerly portion conveyed to State of Oregon by deed dated April 21, 1951, recorded May 1, 1951, in Book 1473, page 528, Deed Records of Multnomah County, Oregon.

## "II.

"That Multnomah County is and at all times herein mentioned was a political subdivision of the State of Oregon.

## "III.

"That from and after the 15th day of April, 1952, to the time of the filing of this amended complaint the defendant, its agents, servants and employees engaged in certain rock and stoneblasting operations in which it exploded or caused to be exploded large quantities of explosives at or near certain property owned by the defendant and known as Rocky Butte, Multnomah County, Oregon, and in close proximity to the plaintiffs' real property hereinabove described.

## "IV.

"That said rock and stone-blasting operations were conducted by defendant in connection with and in furtherance of its operation of a rock quarry in conjunction with its operation of a County jail, both located at or near the said Rocky Butte.

## "V.

"That at all times herein mentioned the defendant conducted said rock and stone blasting operations in disregard of plaintiffs' protests concerning the injury to plaintiffs' property, notwithstanding the fact that defendant knew that its rock and stone blasting operations were progressively damaging plaintiffs' property.

## "VI.

"That the explosions above described were set off at intervals during the period of time above described and produced great and violent concussions and vibrations of the earth and air, which concussions and vibrations shook and vibrated the plaintiffs' land and dwelling house and the air above and around them and caused injury and damage to plaintiffs' land and dwelling house and interfered with plaintiffs' use and enjoyment thereof.

## "VII.

"That said blasting operations produced recurrent vibrations causing cumulative damage and injury to said property as hereinafter described, and unreasonably interfered with plaintiffs' use and enjoyment of said house and land.

## "VIII.

"That said damage and injury did not appear to an extent that could be measured exactly after each blast.

## "IX.

"That damage and injury to plaintiffs' real property and dwelling and personal property therein, and interference with plaintiffs' use and enjoyment thereof, caused by the defendant, consisted of damage to the foundation and superstructure of said dwelling house by the chipping and cracking of walls, floors and ceilings thereof, causing said walls, floors and ceilings to buckle, slip and settle and causing leakage of water into the basement of said house, of chipping and cracking of brick, tile and concrete surfaces, including chipping and cracking of an outdoor patio and fireplace and destroying a cesspool, both adjoining said dwelling house and located upon said land, of injuring and destroying plaster, paint and wallpaper on the walls and ceilings of said dwelling house, of binding and sticking of doors and windows in said dwelling house, of destruction of an underground storage tank for fuel oil and loss of contents thereof, of damage to furniture and other items of personal property from dirt, sand and dust from said explosions, and of damage and breakage to various items of personal property situated in said dwelling house and belonging to plaintiffs, all to the plaintiffs' damage and loss in the sum of $8,500.00.

## "X.

"That the deprivation of the use and enjoyment of and physical damage to said real property, as

herein alleged, constituted a taking of plaintiffs' property by the defendant for the public purpose hereinabove described.

## "XI.

"That defendant has refused to compensate plaintiffs for the taking of their property hereinabove described although plaintiffs have made demand therefor from defendants through its Board of County Commissioners.

"WHEREFORE, plaintiffs pray for judgment against the defendant in the amount of $8,500.00."

To this amended complaint the defendant filed a demurrer upon the ground and for the reason that the amended complaint failed to state a cause of action. The defendant relied upon the immunity of the county from tort actions under ORS 30.320, and claimed that the alleged facts contained in the complaint do not constitute a taking of private property for public purposes.

This demurrer was overruled and, after appropriate pleadings, the case was tried to a jury, with verdict for plaintiffs, as before mentioned.

As the first assignment of error, defendant claims:

"The court erred in overruling defendant's demurrer to plaintiffs' amended complaint, as the latter did not state a cause of action either in tort or in inverse condemnation."

We need not concern ourselves whether it states sufficient cause of action in tort because the plaintiffs concede that if it is a mere tort action the county is immune to suit. On page 2 of plaintiffs-respondents' brief they state:

" * * * We are in complete agreement with the appellant that the state cannot be sued without

its consent, that the county, as a political subdivision, shares the state's immunity, and that the maintenance of the county rock quarry is sanctioned by legislative authority. The basis for plaintiffs' cause of action is the waiver of immunity in Article I, Section 18, of the Oregon Constitution."

With this concession on the part of plaintiffs-respondents, we are then confronted with the sole question of whether the complaint states sufficient facts to constitute a taking of private property for public purposes in order to determine whether the overruling of the demurrer was proper.

Tested by the well-known rules of passing on demurrers to complaints, without setting them out again in detail, we believe the demurrer was properly overruled. The plaintiffs did allege interference with their use and enjoyment of the house and property by reason of the concussion from the blasts and from dirt, sand and dust. They then allege under Paragraph X:

"That the deprivation of the use and enjoyment of and physical damage to said real property, as herein alleged, constituted a taking of plaintiffs' property by the defendant for the public purpose hereinabove described."

Possibly a motion to make more definite and certain, asking the pleading of additional facts, or a motion to strike some of the matters pleaded would have had merit; but, tested by demurrer, the complaint is sufficient.

■ At the close of plaintiffs' case, the defendant-appellant moved for a nonsuit, which is made the basis of assignment of error No. II. The motion for a nonsuit was denied, but the court's ruling thereon was not made until after much of defendant's testimony

was produced. Thereafter a motion for directed verdict was made at the close of defendant's case on substantially the same grounds as the motion for nonsuit. This was denied. Later, a motion for judgment notwithstanding the verdict was filed, and was denied by the court.

The rulings on these motions bring us directly to the question: Was evidence produced sufficient to amount to a "taking" under Article I, § 18, Oregon Constitution, which, as far as relevant, provides:

"Private property shall not be taken for public use, * * * without just compensation; * * *."

This rule of no taking without just compensation applies to all condemnation cases, and it applies with like effect in those states, including Oregon, which hold that inverse condemnation actions may be brought where there is a "taking" without condemnation procedures, and the property owner files his action against the state, county or other party taking the property. The troublesome question usually is: What constitutes a taking? If there is a "taking" of a private individual's property and a proper case for "inverse condemnation," then the state, or, in this case, the county, is liable in an action for payment of the value of the property taken. But if there is not a "taking" sufficient to sustain a case for "inverse condemnation" and amounts merely to a claim under tort action, the county is not liable. We have several cases in Oregon cited by both parties that serve as a guide to the meaning of a "taking," particularly in flooding, overflowing and washing away of private parties' lands.

■ *Gearin v. Marion County,* 110 Or 290, 223 P 929, was an action against the county for damages result-

ing from their employees releasing a large quantity of logs, trees and stumps from the piers of a bridge to protect the same, and causing the logs and debris to spread out over plaintiff's property and inflicting extensive damage to his buildings, property and lands. The court said:

> " * * * The allegations of the complaint make the case one sounding in tort which would be actionable if the acts complained of had been committed by a private individual but are not actionable when charged to have been committed by the county. There was no allegation that plaintiff's land was caused to be flooded by the acts of the county or that any part of plaintiffs' property was converted by the county, or that the county has received any benefit from the acts complained of. The acts done by the county were done without any intention to exercise the power of eminent domain or to take plaintiff's property or any part thereof for a public use, * * * ."

The court sustained a demurrer to the complaint.

In *Barrett v. Union Bridge Co.*, 117 Or 220, 243 P 93, a contractor for the Highway Commission built an approach to a bridge on a street, in accordance with plans, and it deprived plaintiffs of the use of the street from their property. Injunction was denied. While there were other matters entering into the decision, the court pointed out:

> "* * * There has been no invasion of plaintiffs' property in any physical sense; both the title and possession remain undisturbed."

In *Morrison v. Clackamas County*, 141 Or 564, 18 P2d 814, this court said:

> "According to the more modern authorities, any destruction, restriction or interruption of the common and necessary use and enjoyment of the prop-

erty of a person for a public purpose constitutes a 'taking' thereof."

To sustain that proposition the court cited: *Kurtz v. Southern Pacific Co.*, 80 Or 213, 155 P 367, 156 P 794; *Mosier v. O. W. R. & N. Co.*, 39 Or 256, 64 P 453, 87 Am St Rep 652; 20 CJ 666, § 138; Lewis on Eminent Domain, 3d ed, §§ 65 and 66; *Eaton v. Ry. Co.*, 51 NH 504, 12 Am St Rep 147; *Stockdale v. Rio Grande Western Ry Co.*, 28 Utah 201, 77 P 849; *Knowles v. New Sweden Irrigation District*, 116 Idaho 217, 101 P 81. In the Morrison case, the court then says:

> "When the current or flow of a stream of water is obstructed or diverted from its natural course for a public use, so that it invades and totally destroys private property or materially decreases its value, it amounts to a taking within the meaning of the state and federal constitutions.   *   *   *
>
> "It is not necessary that the owner of the property be actually dispossessed or that the property be completely destroyed in order to constitute a taking within the meaning of the constitutional provisions."

Many citations are set out to sustain the above statements which we will not repeat here.

There is no doubt that prior to and at the time of the *Morrison v. Clackamas County* decision the modern trend was to liberalize the rights of the private property owner and his claims for alleged "takings," but this was accomplished in many instances by changes in the constitutional provisions requiring compensation to be paid before the taking, and more generally by providing in the constitution that private property shall not be *taken or damaged*.

More than half of the states now have the "taken or damaged" clause in their constitutions, and cases

under such constitutional clauses are often cited as liberalizing the doctrine, when in reality they are merely holding in conformity with a more liberalized constitution. It is more often a matter of the law and constitutions than changes in attitude of the courts toward the old provisions, although there has been some change. Oregon's constitutional provision as above set forth has not been changed in that regard and does not include the word "damaged" with "taken." Many decisions in other jurisdictions are under constitutions which provide for damages and consequently appear much more liberal than the Oregon decisions.

The *Morrison v. Clackamas County* decision was rendered in determining whether or not a demurrer to the complaint should be sustained. The case of *Tomasek v. Oregon State Highway Commission,* 196 Or 120, 248 P2d 703, is the leading Oregon case on inverse condemnation which has gone through trial on the merits.

In the Tomasek case the Highway Commission had so built up and constructed the new approaches to its bridge over the Santiam River northwest of Jefferson, on Highway 99E, that it caused a serious diversion of the flood waters of the river and caused the erosion and washing away of most of the top soil on 63 acres of plaintiff's land. The effect of the erosion was to wash away and remove the surface soil, leaving only a gravelbed and rendering it worthless for farming purposes. It was originally rich, fertile farmland. There was ample proof that reconstruction of the highway was the direct cause of plaintiff's loss of a large part of his lands. This court held that the Highway Commission's acts constituted a taking, and said:

"* * * But the direct effect of this con-

struction was a partial destruction of plaintiff's lands, it constituted a taking for a public purpose within the meaning of the constitution. It is the *fact of taking*, rather than *manner of taking*, that is important." (Emphasis added)

In each of the Oregon cases above discussed and in other Oregon cases on the subject of inverse condemnation, there has been a substantial taking or destroying of the individual's property. Most of them have involved flooding and erosion, but the "taking" has deprived the owner of a substantial part of his property as well as the use thereof, and usually permanently.

In the case under consideration, there is no evidence that the plaintiffs were forced to abandon their property or any part thereof. There was no cessation of the use thereof, except possibly the small amount of water in the basement for a short time, which was, no doubt, an inconvenience but surely not a deprivation of use and enjoyment sufficient to amount to a "taking" under the Oregon Constitution, even giving full credence to the so-called modern trend.

There is no doubt that there was some "damage," but, as above pointed out, the people of Oregon have not seen fit to amend their constitution to include "damage" with "taking" so as to waive the immunity of the state or county in those actions for damages which do not amount to a "taking." There are no cases in Oregon ruling directly on whether blast or concussion cases can be brought as inverse condemnation cases, and comparatively few from other jurisdictions, except those brought and decided under the "damage" part of the constitution.

Plaintiffs-respondents cited the case of *Adams & Sullivan v. Sengel,* 177 Ky 535, 197 SW 974, a Kentucky

blasting case, in which a verdict for damages to buildings was returned in the lower court. The case was reversed in the Supreme Court for the failure of the court to give proper instructions on assessing damages. In that case, it was held that the blasting was a direct trespass, by the casting of rocks, debris and soil upon plaintiffs' property. The court also sets out that § 22 of the constitution provides for compensation for property taken, injured or destroyed. This is much broader than the Oregon Constitution.

In the case of *Peabody v. United States,* 231 US 530, the court pointed out that if heavy guns from a battery were discharged over plaintiff's property so as to deprive the owner of its profitable use, it would constitute such a servitude as to amount to a taking. But that court further pointed out, however, that in order to maintain an action for such taking it must appear that the servitude has actually been imposed on the property. A contract to pay cannot be implied unless there has been an actual appropriation of the property. The claims court was affirmed in its denial of the claim.

The case of *United States v. Causby,* 328 US 256, 66 S Ct 1062, 90 L ed 1206, cited by the plaintiffs, was a claim resulting from continuous flights of heavy bombers and other government planes over plaintiffs' home and acreage. The flights were at low levels (60 to 80 feet) near the airport. The United States Supreme Court, in a majority opinion by Mr. Justice Douglas, held for plaintiffs on the taking, saying, "* * * the land is appropriated as directly and completely as if it were used for the runways themselves."

The United States had conceded, on oral argument, that if the flights over plaintiffs' property

rendered it uninhabitable there would be a taking under the Fifth Amendment. A dissenting opinion by Mr. Justice Black, in which Mr. Justice Burton concurred, was filed, on the primary grounds that the flights over the claimants' property did not constitute a "taking." The extent of showing required for a "taking" was viewed differently in the two opinions. It would seem that the acts complained of there were so much stronger and more frequent than in the present case, that there is very little comparison. In the Causby case, only an easement was taken, and it was sent back to the lower court for a finding as to whether the easement should be permanent or merely temporary.

The cases of *Great Northern Ry. Co. v. State*, 102 Wash 348, 173 P 40, and *Spokane, Portland & Seattle Ry. Co. v. State*, 159 Wash 529, 294 P 231, cited by the plaintiffs-respondents, are Washington cases which come under that state's constitutional provisions of taking and damaging, and in each case large quantities of earth and rock were deposited or caused to slide onto plaintiff's property and tracks, and definitely stopped their use, until considerable time and money were expended in removal of debris and repair and replacing of the property.

The case of *County of Mojave v. Chamberlin*, 78 Ariz 422, 281 P2d 128, was an Arizona case, and that state, also, has a "taking and damaging" clause in its constitution.

In the very recent (April 22, 1959) case of *Crisafi et al. v. City of Cleveland*, 169 Ohio St Rep 137, 158 NE2d 379, the Supreme Court of Ohio held that damage to plaintiff's building resulting from concussions from a blast on the city's park and zoo property was not compensable on the ground that there was a pro tanto appropriation of plaintiff's property. That

blast was a single isolated act, but otherwise it was similar to the case before us, and Ohio's constitution is limited to the "taking" similar to that of Oregon.

In the case of *Bartholomae Corporation v. United States,* 253 F2d 716, the United States Circuit Court of Appeals (9th Cir) held that damage to buildings and property of the plaintiff resulting from atomic energy and nuclear detonations and the vibrations therefrom was not compensable. The court said:

> "The trial court also determined as a matter of law that there was not a taking of the property of the plaintiff for a public use. We affirm this holding."

The above statement was not elaborated on. The case was reported August 15, 1957, and rehearing denied January 11, 1958.

See also the case of *Sullivan v. Commonwealth,* 335 Mass 619, 142 NE2d 347, decided by the Supreme Court of Massachusetts in April, 1957.

We find no decision under a constitutional provision similar to ours which has held that intermittent blasting concussions, such as here shown, have amounted to a taking. There were no rocks nor debris deposited upon the property of the plaintiffs. Dust was brought over occasionally, causing rewiping of dishes that had been sitting for some time. The plaintiffs continued to use the premises without interruption.

We hold that "taking" as defined in *Morrison v. Clackamas County,* supra, and as shown in *Tomasek v. Oregon State Highway Commission,* supra, is still the proper definition and rule in Oregon.

The plaintiffs in this case have failed to prove either actual physical taking of the plaintiffs' property by

the defendant, or sufficient evidence of destruction, restriction or interruption of the necessary use and enjoyment of their property to warrant recovery under the theory of inverse condemnation, by the standards set by this court in the two above-mentioned cases.

Defendant was entitled to a directed verdict after all the evidence was in and motion made therefor.

In view of this holding, it was not necessary to decide the other questions raised as to the proper way of proving damages. These rules are very well set out in many Oregon cases and it would unduly lengthen this decision to cite and discuss them.

The judgment is reversed and plaintiffs' complaint is dismissed.