Argued and submitted July 29, 2010, affirmed February 23, petition for review allowed July 22, 2011 (350 Or 532)

Sharon DUNN,
*Plaintiff-Respondent,*

*v.*

CITY OF MILWAUKIE,
an Oregon municipality,
*Defendant-Appellant.*

Clackamas County Circuit Court
CV07040247; A139386

250 P3d 7

Michael A. Lehner argued the cause for appellant. With him on the briefs was Lehner & Rodrigues PC.

Kenneth Dobson argued the cause for respondent. With him on the briefs was Buckley LeChevallier, P.C.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Rosenblum, Judge.

SCHUMAN, P. J.

**SCHUMAN, P. J.**

Defendant, the City of Milwaukie, appeals from a judgment awarding plaintiff $58,333 plus attorney fees as compensation for damage to her home resulting from raw sewage that backed up through bathroom fixtures when the city "hydrocleaned" a nearby sewer line. The theory on which plaintiff prevailed was "inverse condemnation"—that is, a claim that, by inflicting the damage, the city effected a taking of her property by substantially interfering with her use of it and therefore owed her just compensation under Article I, section 18, of the Oregon Constitution.[1] *See Suess Builders v. City of Beaverton*, 294 Or 254, 258 n 3, 656 P2d 306 (1982) (defining "inverse condemnation"). Defendant argues that the court erred in denying its motion for a directed verdict on two grounds: first, that plaintiff presented no evidence that the city intended the harm; and second, that plaintiff's property was not "taken" because the damage caused by the sewage was not a substantial interference. In addition, the city argues that the court erred by giving the jury an instruction that misstated the law regarding intent. We affirm.[2]

In reviewing the denial of defendant's motion for a directed verdict, we view the evidence and reasonable inferences drawn from it in the light most favorable to plaintiff. *Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995). Our review "is circumscribed by the case actually presented to the jury through pleadings, evidence, and jury instructions." *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 333 Or 304, 310, 39 P3d 846 (2002).

In August 2005, two city workers were performing a routine "hydroclean" of the sewer lines in plaintiff's neighborhood as part of the city's regular sewer maintenance. Hart, the senior employee, inserted the hose from an aquatech truck ("a big truck with a thousand-gallons or so water tank on the back") into a manhole and blasted water into the line at a pressure of approximately 1,500 to 2,000 pounds per

---

[1] Article I, section 18, of the Oregon Constitution provides, in part, "Private property shall not be taken for public use * * * without just compensation[.]"

[2] Plaintiff advances a cross-assignment of error challenging the trial court's summary dismissal of plaintiff's tort claims as untimely under ORS 30.275. Because we affirm, we need not, and do not, address that issue.

square inch (PSI), directing the force upstream toward a second manhole.

Plaintiff, in her home located between the two manholes, heard a "loud roar," felt the house shake, and witnessed "[b]rown and gray gunky sewer water that stunk" shooting from her toilets and bathroom faucets. Within seconds, the "gunky" water was dripping from the ceilings and "three or four inches thick" on the bathroom floor, "flowing" into the rest of her home. Plaintiff ran outside and saw the second city utility worker standing next to a "City of Milwaukie" truck. Plaintiff explained what happened and, although the employee was "shocked" to learn that plaintiff's home had just filled with sewage, she offered plaintiff some towels but no additional assistance or explanation. Plaintiff refused the towels, returned to her home, and spent most of the night "sucking up the water stuff" with her wet and dry vac. The city employees' report for the day listed plaintiff's address and the notation, "Blew water out of their toilet."

After cleaning her house, plaintiff "thought [she] had it taken care of" and did not immediately contact the city. Although the sewer water had soaked her woolen area rugs, she thought that she could have them cleaned; she did not notice any other property damage at the time. However, a few months later, around January 2006, plaintiff noticed a "sewer smell" in her home that seemed to coincide with use of her furnace. She also noticed that her hardwood floors "were buckled up" and wet, her "wallpaper had bubbled up in [the] entryway and [the] dining room," and her vents were "blowing up wet moisture." After consulting with various experts and contractors to determine the cause and extent of the damage, plaintiff contacted the director of the Milwaukie Utility Department and was advised to file a claim with the city's risk management office. She did so. The city denied the claim, and plaintiff filed this action.

In her complaint, plaintiff alleged a variety of tort claims as well as a claim for inverse condemnation under Article I, section 18, alleging that the city had "substantially constructively deprived [plaintiff] of her interest in [her] real property." The trial court dismissed the torts claims as untimely, and the inverse condemnation claim proceeded.

Plaintiff presented evidence of the damage to her house and called an appraiser to testify that its value had decreased as a result of the sewage intrusion incident. The appraiser attributed that loss in part to the actual property damage and in part to the stigma that buyers would associate with the property after plaintiff disclosed the sewage incident. The appraiser estimated that the difference in the home's value pre- and post-sewage intrusion was about $100,000.

At the close of plaintiff's case, defendant moved for a directed verdict, arguing that plaintiff had failed to show that the city intended to take her property or that she had sustained damages sufficient to constitute a taking. The trial court denied defendant's motion. Ultimately the jury returned a verdict for plaintiff and awarded her damages of $58,333.

As noted above, under Article I, section 18, of the Oregon Constitution, if a government entity takes private property for a public use, it must provide the owner with just compensation. Typically, actions involving Article I, section 18, revolve around a government entity exercising its power of eminent domain by condemning private property; the dispute is generally about the adequacy of the compensation. However, if government, in the process of performing some act for the benefit of the public, inflicts a substantial interference with the use and enjoyment of private property, that act can amount to a taking and give rise to a claim by the property owner for compensation. *See Morrison v. Clackamas County*, 141 Or 564, 571-72, 18 P2d 814 (1933). To prevail in such a claim, however, the property owner must prove that the government intended to cause damage, *Vokoun v. City of Lake Oswego*, 335 Or 19, 26, 56 P3d 396 (2002), and that the damage amounted to a substantial interference with the owner's use and enjoyment of the property, *Hawkins v. City of La Grande*, 315 Or 57, 68-69, 843 P2d 400 (1992). Defendant argued below, and argues again on appeal, that plaintiff failed to adduce any evidence of either intent or substantial interference.

Defendant's argument regarding intent—as well as plaintiff's responses—derive from *Vokoun*. In that case, the plaintiffs argued that they could prevail without proving

intent. The Supreme Court reviewed the history of inverse condemnation in Oregon courts and rejected that claim: "This court long has held that a claim for inverse condemnation requires a showing that the governmental acts alleged to constitute a taking of private property were done with the intent to take the property * * *." *Vokoun*, 335 Or at 27. More significantly for purposes of this case, however, the court also held that "[a] factfinder may *infer* the intent to take from the governmental defendant's action if, as this court stated in *Morrison*, the natural and ordinary consequence of that action was the substantial interference with property rights." *Id.* at 29 (emphasis added).

The governmental action at issue in *Vokoun* was Lake Oswego's construction of a storm drain upstream from the plaintiffs' land. *Id.* at 21-22. That drain, according to the plaintiffs, diverted water in a manner that caused erosion to a hillside near the plaintiffs' property. Over some period of time, the erosion resulted in a landslide that damaged the plaintiffs' house. In ruling that the plaintiffs had presented sufficient evidence to overcome the city's motion for a directed verdict, the court explained:

> "That the jury heard conflicting evidence on virtually every issue regarding plaintiffs' claim for inverse condemnation is of no moment in our review of whether the trial court erred in denying the city's motion for a directed verdict on that claim. The city built the storm drain, and it is undisputed that a storm drain is a public work, serving a public purpose. Before the storm drain was built, there was no natural drainage course in the ravine. The storm drain collected more than five times the amount of water that naturally flowed through the area where the landslide occurred. The outfall pipe dispersed that water with such force that the water carved a drainage course along the ravine. The water was directed at, and caused, unnatural erosion along the drainage course, undermining the toe of the slope that supported the hillside on which plaintiffs' property is located. *One reasonable inference* from the foregoing evidence is that the landslide was the natural and ordinary (even inevitable) consequence of the city's construction of the storm drain in that manner. It follows that there is evidence in the record to support the jury's verdict."

*Id.* at 30 (emphasis added).

■ Following *Vokoun*, the question in this case is whether "there is evidence" that the sewage intrusion was the natural and ordinary consequence of the city's hydro-cleaning. *Id.* The city contends that the situation here is analogous to the situation in *Worman v. Columbia County*, 223 Or App 223, 225, 195 P3d 414 (2008), where we reviewed the trial court's grant of summary judgment for the defendant, Columbia County, on the plaintiffs' inverse condemnation claim. In that case, the plaintiffs "suspected that someone had sprayed some type of herbicide into their yard, but they were unable to identify the culprit." *Id.* They then filed a complaint alleging, "An unknown person sprayed a mix of Round Up + Cross Bow beginning at our property boundary at front of house and around side of property line[.]" *Id.* at 226. The county moved for summary judgment, and the trial court granted the motion. On appeal, we affirmed:

> "The question in this case is similar to that in *Vokoun*: Have plaintiffs pleaded facts from which a juror could find that the governmental defendant intended to take their property for a public use? And, as in *Vokoun*, the question further reduces to whether plaintiffs have alleged facts from which a juror could find that the damage to their property was a 'natural and ordinary consequence' of the county's action.

> "* * * * *

> "Plaintiffs have not alleged (or offered any evidence) that a county spray program for roadside ditches would naturally and ordinarily cause damage to plaintiffs' property in particular, or, for that matter, that the spray program, properly carried out, would naturally or ordinarily cause damage to *any* property. In fact, plaintiffs' theory is that, had the county not performed those spray operations in a negligent manner, plaintiffs' property would not have been harmed. Those allegations are materially different from— and do not give rise to the same inferences of intent as— allegations that the county designed and carried out a project for public use that would damage their property as a natural and ordinary consequence of the project."

*Id.* at 236-37 (emphasis in original).

We are not persuaded that this case is similar to *Worman*. Unlike the plaintiffs in *Worman*, plaintiff here did

not argue at trial that the city's program was negligently designed, nor that the city's employees maliciously or negligently carried out that program.[3] Rather, the evidence at trial was that the city employees carried out the hydroclean program "by the book": If, pursuant to a particular hydrocleaning episode, the default level of pressure—1,500 to 2,000 PSI—causes sewer water or a sewage stench to flow to the bathroom fixtures of a home or business, utility employees designate the area as one requiring "low pressure." That information is recorded in a work report and then denoted on a map that identifies "low pressure areas" around the city. "Low pressure" areas, in other words, are identified as such after a normal pressure hydroclean results in intrusion.

It is true, as defendant argues, that the city workers testified that backflow into homes is unusual. That fact is not dispositive. The question is not whether the harmful result occurs frequently; it is whether the result is a natural and ordinary consequence of the government's action at the time and place where that action occurred. Thus, for example, the question in *Vokoun* was not whether landslides undermining homes occur frequently following the construction of drainage ditches; the question was whether the undermining landslide was a *natural and ordinary* consequence of the construction of the drainage ditch adjoining the plaintiffs' property—a consequence that was the last link in a chain of events that began with the governmental action and proceeded, without *un*natural or *extra*ordinary intervening causes, to produce the damage. With that understanding, a reasonable inference from the evidence in the present case is that the sewage intrusion plaintiff experienced was the natural and ordinary consequence of the city's high-pressure hydrocleaning of the sewer lines running in front of her house. In sum, we are satisfied that the record contains evidence sufficient to support the jury's verdict.

Defendant's next contention is that, intent notwithstanding, the trial court erred in denying defendant's motion for a directed verdict because plaintiff presented evidence of merely "repairable damage," which is insufficient to show a

---

[3] It is of no import that, had the trial court not dismissed plaintiff's negligence claim, such arguments might have been advanced.

"substantial interference" with plaintiff's use and enjoyment of her property. We do not agree.

Defendant cites *Moeller v. Multnomah County*, 218 Or 413, 345 P2d 813 (1959), for the proposition that mere damage cannot constitute a taking. In that case, the plaintiffs brought an inverse condemnation claim against Multnomah County "for damages to their property by blasting operations conducted by the county at their rock quarry" near the plaintiffs' home. *Id.* at 414. The county appealed following a jury verdict in the plaintiffs' favor. On review, the Supreme Court reversed, holding that the plaintiffs' evidence of property damage at trial did not amount to a taking. The evidence showed that the blasting had caused cracks

> "in the concrete of the basement and patio floors and in the walls and ceilings of some rooms. On one occasion the top of the brick chimney in the patio was knocked or shaken off. There was damage to the cesspool which catches the water from wash basins and the eaves, and this caused some water to back up into the basement of the house. Various other substantial items of damage were testified to, and the cost of repairs and estimation of repairs were substantial."

*Id.* at 415-16. The court concluded:

> "There is no doubt that there was some 'damage,' but * * * the people of Oregon [unlike those in some other states] have not seen fit to amend their constitution to include 'damage' with 'taking' so as to waive the immunity of the state or county in those actions for damages which do not amount to a 'taking.'
>
> "* * * * *
>
> "The plaintiffs in this case have failed to prove either actual physical taking of the plaintiffs' property by the defendant, or sufficient evidence of destruction, restriction or interruption of the necessary use and enjoyment of their property to warrant recovery under the theory of inverse condemnation * * *."

*Id.* at 427, 430-31.

We agree with defendant that Article I, section 18, does not expressly define a "taking" as "property damage,"

and that *Moeller* provides some support for its position. However, defendant's argument sets out only a truncated analysis of the case law interpreting a valid claim for inverse condemnation under Article I, section 18. That law has evolved significantly in the 52 years since *Moeller*. Even before that case, the Supreme Court had held that "[i]t is not necessary that the owner of property be actually dispossessed or that the property be completely destroyed in order to constitute a taking within the meaning of the constitutional provisions." *Morrison*, 141 Or at 569. More recently, the Supreme Court, explaining *Moeller*, acknowledged that "property is not 'taken' if it is simply damaged," *Hawkins*, 315 Or at 68, but went on to elaborate that a "taking" requires " 'destruction, restriction or interruption of the necessary use and enjoyment of [the] property,' " *id.* (quoting *Moeller*, 218 Or at 431) (brackets in *Hawkins*), and that "[m]ost cases boil this definition down to a test of whether there has been a 'substantial' interference with property rights," *id.* Most recently, the Supreme Court has summarized: "To establish a taking by inverse condemnation, the plaintiff is not required to show that the governmental defendant deprived the plaintiff of all use and enjoyment of the property at issue. *See Morrison* * * *. A 'substantial interference' with the use and enjoyment of property is sufficient." *Vokoun*, 335 Or at 26 (quoting *Hawkins*, 315 Or at 68-69). In a somewhat different vein, the court has explained:

> "The proper test to determine whether there has been a compensable invasion of the individual's property rights in a case of this kind is whether the interference with use and enjoyment is sufficiently direct, sufficiently peculiar, and of sufficient magnitude to support a conclusion that the interference has reduced the fair market value of the plaintiff's land by a sum certain in money."

*Lincoln Loan v. State Hwy. Comm.*, 274 Or 49, 56, 545 P2d 105 (1976) (quoting *Thornburg v. Port of Portland*, 244 Or 69, 73, 415 P2d 750 (1966)).

■    With that broader statement of the law in mind, we turn to the record, viewed in the light most favorable to plaintiff. *Vokoun*, 335 Or at 21. Sewer water flowed into plaintiff's home, immediately damaging area rugs and causing lasting

damage to her ventilation system, hardwood floors, wallpaper, and sheetrock. On the advice of a heating contractor, plaintiff stopped using her furnace, relying instead on space heaters, and also closed off certain rooms during colder months to conserve heat. A hardwood floor expert verified that plaintiff's hardwood floors had sustained water damage and might need to be removed and reinstalled. Another contractor testified to finding "an enormous amount of water damage" and recommended that plaintiff replace sections of sheetrock in her entryway, hallway, and bathrooms. Further, plaintiff presented abundant evidence that the sewage intrusion significantly diminished the value of her home. An appraiser testified that, because of damage and stigma, the home lost approximately $100,000 in value. In sum, we conclude that plaintiff presented evidence to support a finding that plaintiff experienced a "substantial interference" with the use and enjoyment of her property.

■     Defendant's final assignment of error challenges the jury instruction that the trial court gave explaining the requisite intent for an inverse condemnation claim. We review jury instructions, as a whole, for legal accuracy and will not reverse "unless [we] can fairly say that the instruction[s] probably created an erroneous impression of the law in the minds of the [jurors] which affected the outcome of the case." *Waterway Terminals v. P. S. Lord*, 256 Or 361, 370, 474 P2d 309 (1970). The instruction that defendant challenges provided:

> "In order to establish a taking, plaintiff is not required to show any specific intention on the part of the city to appropriate plaintiff's property, nor is she required to establish that the city was negligent."

Defendant argues that the instruction "effectively removed the intent element of the claim for inverse condemnation" by giving the impression that "an unconstitutional taking can occur without any fault." In response to plaintiff's assertion that this court upheld the exact instruction in the *Vokoun* case on remand, defendant avers that *Vokoun* "included additional instructions not given in this case."

■     Both parties are correct: the *Vokoun* court upheld multiple jury instructions, which included—verbatim—the

instruction defendant challenges here. *Vokoun v. City of Lake Oswego*, 189 Or App 499, 503-04, 76 P3d 677 (2003), *rev den*, 336 Or 406 (2004). In this case, the trial court provided additional instructions as well, and explained the law to the jury as follows:

> "Inverse condemnation is a cause of action against a governmental defendant to recover the value of property which has been taken, in fact, by the governmental defendant, even though no formal exercise of power of eminent domain has been attempted by the taking agency. In order to find that there has been inverse condemnation, *you must find that the defendant intended to take the property* and that there was a taking.
>
> "\* \* \* \* \*
>
> "In order to establish a taking, plaintiff is not required to show any specific intention on the part of the city to appropriate plaintiff's property, nor is she required to establish that the city was negligent. Rather, the city is responsible for the natural consequences of its actions, regardless of whether those consequences were, themselves, intended."

(Emphasis added.) Given that instruction, we cannot fairly say that the jurors probably went to the jury room with an erroneous impression of the law—namely, the impression that intent was not an element of plaintiff's claim.

We therefore hold that plaintiff presented a legally sufficient claim of inverse condemnation to the jury and that the evidence in the record supports its verdict in plaintiff's favor.

Affirmed.