NOT DESIGNATED FOR PUBLICATION

No. 126,331

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ALBERTO ROMERO,
*Appellant*,

v.

NORBERT HORNUNG and
KANSAS WORKERS COMPENSATION FUND,
*Appellees*.

MEMORANDUM OPINION

Appeal from the Workers Compensation Board. Submitted without oral argument. Opinion filed August 30, 2024. Affirmed.

*Peter J. Antosh*, of Garcia & Antosh, LLP, of Dodge City, for appellant.

*Travis J. Ternes*, of Watkins Calcara, Chtd., of Great Bend, for appellee.

Before GREEN, P.J., GARDNER and PICKERING, JJ.

PER CURIAM: In 2013 and 2014, Alberto Romero was injured when employed by Norbert Hornung. Romero sought workers compensation benefits for his injuries, and the administrative law judge (ALJ) issued an award. But the Workers Compensation Appeals Board (the Board) overturned it, finding that Romero was not eligible for workers compensation benefits because he had not met his burden to show that his employer, Hornung, met the gross payroll threshold to qualify for coverage under the Workers Compensation Act, K.S.A. 44-501 et seq. (the Act). Finding no error, we affirm the Board.

1

*Romero's Employment and Injuries*

Hornung operated a farm and ranch near Offerle, a small town in southwestern Kansas. Romero, one of his employees, primarily worked for Hornung's manure spreading business, which involved operating heavy equipment and driving a manure truck. When Hornung's manure work was slow, Romero would help Hornung with other farm and ranch duties, such as welding, making repairs, installing fencing, and working the cattle.

Romero testified that when he began working for Hornung in March of 2013, he was paid $10 per hour. At some point, he received a raise to $13 an hour. As is common in the farming industry, his work fluctuated with the weather and the season. Throughout his employment, Romero was injured twice. On August 29, 2013, Romero was in a vehicle rollover accident which injured his left shoulder, head, neck, back, and right leg. This injury required hospitalization and shoulder surgery. Romero testified that he received no pay or other benefits while recuperating and was off work for over a year. Romero did not know if Hornung paid for his medical costs.

After Romero recuperated from that injury, he returned to work for Hornung, but suffered another injury on November 17, 2014. Romero slipped on ice while changing a flat tire on the company truck, injuring his right leg. He was off work for six months, during which Romero claimed he received no pay or benefits and was unaware if Hornung paid any of his medical costs.

Romero testified that he returned to work for Hornung after recovering from his second injury but for only three days a week and his duties were limited to checking fences and cattle. In what was described as a mutual agreement of the parties because of the belief that Romero's physical condition would no longer allow him to drive the manure trucks, Romero's employment ended when the light duty work ended. Yet

2

Romero also admitted his employment stopped with Hornung due to "criminal complications" for driving under the influence (DUI) and arson charges, which ultimately led to Romero's incarceration. The DUI conviction led to the suspension of Romero's driver's license, which he admitted compromised his ability to work for Hornung.

Romero timely applied for workers compensation benefits for both injuries. Hornung did not carry workers compensation insurance, so the Workers Compensation Fund of Kansas (the Fund) was impleaded.

*Romero's Pay and Hornung's Payroll*

Before Romero's claims for workers compensation benefits were fully litigated, Hornung had passed away. But before he died he gave two depositions in this case which revealed the following.

Some of Romero's wages were paid by checks issued by his accountant upon Hornung's request, but Hornung also testified that "[i]f [Romero] caught me and he needed money I'd have some cash in my pockets I'd just pull it out and give it to him."

Hornung also gave Romero payments "in kind" or ostensibly fringe benefits. After about six months of Romero's employment, Hornung gave him access to a pick-up truck that Hornung owned and maintained. Romero testified that he was given use of a company truck, which included the payment of gas, but that he was never allowed to use the truck except for commuting to and from work. Additionally, when work was slow, Hornung testified that he would make up for lost hours by occasionally paying Romero's rent in amounts of $325 to $375. But he also testified that he always paid Romero's rent while Romero was working for him. To the contrary, Romero denied that Hornung ever paid his rent. Hornung also testified that he paid for a lawyer for Romero on at least one occasion to try to reinstate Romero's driver's license.

3

Hornung believed that his automobile insurance company paid the medical bills incurred by Romero's injuries. He did not recall Romero returning to work for him after the second injury.

Hornung testified that he would sometimes pay Romero on a barter-like basis. For example, he would give Romero materials for Romero's personal welding projects or let Romero sell scrap metal from the farm and let him keep the earnings as his pay.

Hornung's accountant, Ronald Schneweis, testified about Hornung's payroll records. In 2012, the year before Romero began working for Hornung, Hornung's payroll shows payments totaling $1,221. In 2013, the year Romero started working for Hornung, the payroll records show $11,094 in total payroll payments for three employees. Hornung's 2014 total payroll was only for Romero, whose payments that year were $14,692.

Schneweis described Hornung as "not the most efficient in providing documentation." He also testified that Hornung was behind on his personal income taxes and that he was not privy to all of Hornung's business operations. When paid by check, Hornung's employees received checks issued from Schneweis' office when Hornung would call and report the employees' hours worked. Schneweis did not do any of Hornung's banking and never saw his bank statements.

*Romero's Workers Compensation Award*

Romero's workers compensation claims languished for years while Romero was incarcerated and then for some time after. Eventually, in November 2022, the two claims came before an ALJ for a hearing to determine Romero's award, if he so qualified. The cases were in all practicality consolidated, as the award issued was for Romero's injuries in 2013 and 2014 and was based on much of the same evidence.

4

Before the ALJ, the Fund argued that the parties were not covered by the Act because Hornung did not exceed the necessary $20,000 annual gross payroll threshold. See K.S.A. 44-505(a)(2).

Regarding 2013, the ALJ found that "using reasonable inferences on payroll records alone, in 2013 there is a $3,216.88 shortfall of the $20,000.00 threshold." But the ALJ then added amounts of rent Hornung paid for Romero ($3,000), Romero's use of Hornung's truck, and cash payments from Hornung to Romero, which took Hornung over the $20,000 payroll threshold. The ALJ found the circumstantial evidence "is compelling that if one included all of [Romero's] actual compensation from employment, total employee pay, and benefits, then [Hornung's] employee remuneration surpassed the $20,000 threshold."

As for 2014, the ALJ concluded that payroll records showed Hornung met the threshold because Hornung's business records kept by Schneweis totaled $22,111. But that figure does not appear in the payroll documentation or Schneweis' testimony.

The ALJ thus held that for the relevant years of 2013 and 2014, Hornung met the $20,000 threshold by a preponderance of the evidence and was thus subject to the Act. The ALJ awarded Romero $23,448.30—$20,270.72 for the 2013 injury, and $3,177.58 for the 2014 injury.

The Fund applied for review to the Board challenging only whether Romero met his burden of proof that Hornung was covered under the Act.

*The Board's Decision*

The Board looked to K.S.A. 44-505(a)(2) and held that for the 2013 injury the relevant payroll years were the preceding calendar year (2012) and the current calendar

year (2013). For the 2014 injury, the relevant years were 2013 and 2014. The Board held: "Based upon the testimony and exhibits provided by Mr. Schneweis, [Hornung's] payroll did not exceed the $20,000 threshold set forth in K.S.A. 44-505(a)(2) in any of the years at issue."

The Board found that the ALJ's use of rent payments and a company truck as additional compensation was based on speculation and not sufficient evidence:

> "The record is unclear regarding the value of the rent and truck use. The record is unclear when rent was paid and the truck used. Even the simplest of information, such as what kind of a truck was lent to [Romero], is absent from the record. It is difficult to find paid rent as additional compensation when [Romero] denies [Hornung] ever paid rent. The ALJ's finding the rent and truck use should be added as additional compensation is based on speculation and is unsupported by the record. This finding requires the Board to make a leap of faith it is unwilling to make.
>
> "Absent proof of the value of rent and when it was paid, combined with the lack of evidence regarding the value of the truck use and how often it was used, the evidence does not establish, on a more probably true than not standard, [Hornung] had the statutorily required payroll for application of the Kansas Workers Compensation Act."

It concluded that the record failed to prove payroll totals for the relevant years were above the $20,000 threshold, so the Act did not apply. Accordingly, it reversed the ALJ's award and denied Romero compensation from the Fund.

Romero timely petitioned this court for judicial review of the Board's order.

*The Board properly held that the Act did not cover Romero because Hornung did not reach the minimum payroll threshold for coverage required by K.S.A. 44-505(a)(2).*

On appeal, Romero argues that the Board erred by reversing the ALJ's award because substantial evidence shows that Hornung's payroll exceeded the $20,000 gross payroll threshold required for the Act to apply. That evidence is the additional compensation the ALJ used—Hornung's payment of Romero's rent and his providing Romero a company vehicle to use for commuting. Although he frames his argument as one of mere statutory interpretation, Romero's argument challenges the sufficiency of the evidence supporting the Board's decision.

Under the Act, our standard of review is statutorily controlled by the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. See K.S.A. 44-556. The KJRA provides that appellate courts review the Board's factual determinations to verify that they are supported by substantial evidence "in light of the record as a whole." K.S.A. 77-621(c)(7). The KJRA defines "in light of the record as a whole" to mean

> "that the adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact." K.S.A. 77-621(d).

"Substantial evidence in a workers compensation case is evidence that possesses something of substance and relevant consequence that induces the conclusion that the award is proper; it furnishes a basis of fact from which the issue raised can reasonably be resolved." *Olds-Carter v. Lakeshore Farms, Inc.*, 45 Kan. App. 2d 390, 394, 250 P.3d

825 (2011) (citing *Redd v. Kansas Truck Center*, 291 Kan. 176, 183-84, 239 P.3d 66 [2010]). Put differently, substantial evidence is "such evidence as a reasonable person might accept as being sufficient to support a conclusion." *Herrera-Gallegos v. H & H Delivery Service, Inc.*, 42 Kan. App. 2d 360, 363, 212 P.3d 239 (2009). When reviewing the Board's findings, we will not reweigh evidence. K.S.A. 77-621(d). Rather, we consider credibility determinations and review the Board's explanation for why the evidence supports its findings. *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

While we give deference to the Board's evidentiary conclusions, we give no deference to the Board's interpretation of legal issues. *Trevizo v. El Gaucho Steakhouse*, 45 Kan. App. 2d 667, 671, 253 P.3d 786 (2011). To the extent that resolution of Romero's appeal involves statutory interpretation, our standard of review is de novo. *Fernandez v. McDonald's*, 296 Kan. 472, 475, 292 P.3d 311 (2013). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be determined. *Johnson v. U.S. Food Service*, 312 Kan. 597, 600-01, 478 P.3d 776 (2021). An appellate court must first attempt to determine legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Bruce v. Kelly*, 316 Kan. 218, 224, 514 P.3d 1007 (2022). "Dictionary definitions are good sources for the 'ordinary, contemporary, common' meanings of words." *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 (2017). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Schmidt v. Trademark, Inc.*, 315 Kan. 196, 200, 506 P.3d 267 (2022).

K.S.A. 44-505(a)(2) provides that the Act does *not* apply to

"any employment, other than those employments in which the employer is the state, or any department, agency or authority of the state, wherein the employer had a total gross annual payroll for the preceding calendar year of not more than $20,000 for all employees and wherein the employer reasonably estimates that such employer will not have a total gross annual payroll for the current calendar year of more than $20,000 for all employees, except that no wages paid to an employee who is a member of the employer's family by marriage or consanguinity shall be included as part of the total gross annual payroll of such employer for purposes of this subsection."

Our task is thus to determine whether substantial evidence supports the Board's factual findings that led it to find that Hornung did not meet the $20,000 gross payroll threshold for coverage under the Act. See K.S.A. 44-505(a)(2). As the claimant, Romero bears the burden of proof to establish his "right to an award of compensation and to prove the various conditions on which [his] right depends." K.S.A. 44-501b(c). So Romero bears the burden to prove that Hornung's gross employee payroll exceeded $20,000 in each applicable year. See *Moore v. Granger Brothers Roofing*, No. 112,739, 2015 WL 5036965, at *4 (Kan. App. 2015) (unpublished opinion).

The language of K.S.A. 44-505(a)(2) is plain and unambiguous. The plain language of the statute indicates that to qualify for coverage under the Act, an employer must have a gross payroll of greater than $20,000 for the year before the accident and, via a reasonable estimation, have a gross payroll greater than $20,000 for the year of the accident. K.S.A. 44-505(a)(2). This language is not ambiguous.

"Payroll" is not defined in the Act, so we look to a dictionary to find its common meaning. Black's defines "payroll" as "[a] list of employees to be paid and the amount due to each of them." Black's Law Dictionary 1364 (11th ed. 2019). "Pay" (the present tense of "paid"), is defined as "money paid, esp. for work or services; wages or salary." Webster's New World College Dictionary 1072 (5th ed. 2018). Beyond these definitions,

common sense and logic dictate that an employer's payroll is based on the wages it pays to its employees.

The Act defines "wage" as "the total of the money and any additional compensation that the employee receives for services rendered for the employer in whose employment the employee sustains an injury arising out of and in the course of such employment." K.S.A. 44-511(a)(3). But "additional compensation" is limited by its statutory definition:

> "The term 'additional compensation' shall include and mean *only* the following: (i) Board and lodging when furnished by the employer as part of the wages, which shall be valued at a maximum of $25 per week for board and lodging combined, unless the value has been fixed otherwise by the employer and employee prior to the date of the accident or injury, or unless a higher weekly value is proved; and (ii) employer-paid life insurance, disability insurance, health and accident insurance and employer contributions to pension and profit sharing plans." (Emphasis added.) K.S.A. 44-511(a)(2)(A).

So, when determining Hornung's gross payroll, we consider both traditional wages and additional compensation which consists of only (1) board and lodging and (2) employer-paid life insurance, disability insurance, health and accident insurance, and employer contributions to pension and profit sharing plans. K.S.A. 44-511(a)(2)(A), (a)(3).

Romero's use of a company vehicle thus cannot be considered when calculating Hornung's gross payroll—K.S.A. 44-511(a)(2)(A)'s list is exclusive yet it does not include vehicle use as "additional compensation." Thus, the Board correctly ruled, albeit on an evidentiary basis, that the vehicle was not to be considered in gross payroll calculations. See *In re Tax Exemption Application of Westboro Baptist Church*, 40 Kan. App. 2d 27, 49, 189 P.3d 535 (2008) ("[W]hen an agency tribunal reaches the right result, its decision will be upheld even though the tribunal relied upon the wrong ground or assigned erroneous reasons for its decision."); see also *Atkins v. Webcon*, 308 Kan. 92,

10

97, 419 P.3d 1 (2018) (citing "right for wrong reasons" rule in workers compensation case).

Board and lodging, however, may properly be considered as "additional compensation." The ALJ included Hornung's purported payments of Romero's rent. But the Board made a credibility determination about the quality of evidence surrounding the rent payments and determined it lacked substantial evidence to include rent payments in Hornung's gross payroll calculations. This is because the evidence failed to show how much rent Hornung paid or when he paid it. And the Board noted "[i]t is difficult to find paid rent as additional compensation when [Romero] denies [Hornung] ever paid rent."

We agree. Without specific evidence of Hornung's alleged rent payments for Romero and with Romero's denial that Hornung ever paid his rent as part of his wages, the record lacks substantial evidence to show that rent payments were additional compensation to be included as part of Romero's wages and, in turn, Hornung's gross payroll. The evidence is not such that a reasonable person might accept as sufficient to support a conclusion. See *Herrera-Gallegos*, 42 Kan. App. 2d at 363. By not providing documentation or testimony as to the amounts or dates Hornung paid for Romero's rent and by denying that Hornung paid any rent for him, Romero failed to meet his burden of proof. See K.S.A. 44-501b(c).

That leaves us with the payroll testimony and documentation from Hornung's accountant, Schneweis. For Romero's 2013 injury to be covered by the Act, Hornung's gross payroll must have exceeded $20,000 in both 2012 (the year before the injury) and 2013 (the year of the injury). See K.S.A. 44-505(a)(2). Hornung's payroll documentation prepared by Schneweis reflects that in 2012, Hornung's payroll totaled $1,221. The record reflects no additional compensation listed in K.S.A. 44-511(a)(2)(A) that would increase that amount for 2012, nor does Romero point us to any. Thus, the Board correctly held that Romero's 2013 injury was not covered by the Act. Consideration of

the 2013 payroll figures for his 2013 injury is unnecessary because payroll in *both* the year before the injury and the year of the injury must exceed $20,000. K.S.A. 44-505 (a)(2).

For Romero's 2014 injury to be covered by the Act, Hornung's gross payroll must have exceeded $20,000 in both 2013 (the year before the injury) and 2014 (the year of the injury). See K.S.A. 44-505(a)(2). Hornung's payroll documentation prepared by Schneweis reflects that in 2013, Hornung's payroll payments totaled $11,094. And the record reflects no other additional compensation listed in K.S.A. 44-511(a)(2)(A) that would increase Hornung's gross payroll for 2013. Therefore, the Board correctly held that Romero's 2014 injury was not covered by the Act. And we need not consider the 2014 payroll figures because payroll in both the year before the injury and the year of the injury must exceed $20,000. K.S.A. 44-505(a)(2).

Romero failed to successfully meet his burden of proof and did not establish his "right to an award of compensation and to prove the various conditions on which [his] right depends" for both his 2013 and 2014 injuries. See K.S.A. 44-501b(c). Thus, under K.S.A. 44-505(a)(2), the Act does not apply to Romero. The Board properly reversed the ALJ's decision and properly denied Romero an award of compensation under the Act.

Affirmed.

12