Submitted on remand from the Oregon Supreme Court July 22, 2014, reversed and remanded with instructions to enter judgment in favor of the city on plaintiff's inverse condemnation claim, otherwise affirmed April 22, 2015

Sharon DUNN,
*Plaintiff-Respondent,*

*v.*

CITY OF MILWAUKIE,
an Oregon municipality,
*Defendant-Appellant.*

Clackamas County Circuit Court
CV07040247; A139386

348 P3d 301

Michael A. Lehner and Lehner & Rodrigues PC filed the briefs for appellant.

Kenneth Dobson and Buckley LeChevallier, P.C., filed the briefs for respondent.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Lagesen, Judge.

DUNCAN, P. J.

**DUNCAN, P. J.**

Defendant, the City of Milwaukie (the city), used highly pressurized water to clean the sewer lines adjacent to plaintiff's house, which caused sewer water to back up through plaintiff's toilets and bathroom fixtures. Plaintiff subsequently brought this action against the city, alleging tort claims and a claim for inverse condemnation. The trial court granted summary judgment against the tort claims on the ground that plaintiff had failed to give the city notice of those claims within 180 days of the injury as required under ORS 30.275, but the inverse condemnation claim was tried to a jury, which found for plaintiff and awarded $58,333 in damages.

The city appealed, arguing that the trial court should have directed a verdict in its favor on the inverse condemnation claim because plaintiff failed to prove a compensable taking of property under Article I, section 18, of the Oregon Constitution. In response, plaintiff cross-assigned error to the dismissal of her tort claims. We affirmed the judgment in plaintiff's favor on the inverse condemnation claim without reaching her cross-assignment of error, but the Supreme Court subsequently reversed that decision on the ground that plaintiff's evidence was insufficient to prove the intentional invasion of property necessary for inverse condemnation. *Dunn v. City of Milwaukie,* 241 Or App 95, 102, 250 P3d 7 (2011), *rev'd,* 355 Or 339, 328 P3d 1261 (2014). The Supreme Court explained, however, that plaintiff was "not necessarily without any remedy" as a result of its holding, because "Oregon has abrogated its traditional sovereign immunity; both the state and other governmental units can be sued on common-law tort theories." *Dunn,* 355 Or at 362. The court explained that plaintiff had in fact attempted to recover in tort, and it remanded the case for us to consider her cross-assignment of error regarding whether she had provided a timely tort-claim notice. We now consider that cross-assignment and conclude that the trial court correctly dismissed plaintiff's tort claims for lack of timely notice under ORS 30.275.

## BACKGROUND

Although plaintiff's inverse condemnation claim was tried to a jury, the issue before us concerns claims that

were dismissed on summary judgment; therefore, we confine our statement of facts to the evidence in the summary judgment record. We state those facts and all reasonable inferences that can be drawn from them in the light most favorable to plaintiff, the nonmoving party. *See Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

In August 2005, plaintiff was inside her home when she heard a loud roar. She went into each of her two bathrooms and found wastewater coming out of the toilets and showers. The wastewater was grayish, had material floating in it, and smelled. Plaintiff ran out of the house and saw a work crew pumping water into a manhole; the crew was using highly pressurized water—a process called "hydrocleaning"—to clean the city's sewer lines. Plaintiff and her neighbor, who had experienced the same phenomenon in her house, approached the crew about the problem. When the neighbor asked a woman in the crew what was happening, she responded, "oh, my god, he used too much pressure."

When plaintiff went back inside her house, the wastewater was running down the hallway and into every room in her house—her living room, family room, kitchen, entryway, and all of her bedrooms. Plaintiff observed three to four inches of water, and saw water going down her heating vents, including vents in both bathrooms, her entryway, and her family room. Plaintiff grabbed towels and blankets from her closet and her garage and threw them down in the hallway and doorways to stop the water.

By the time that plaintiff returned from the garage, the roar had stopped and water was dripping from the walls and ceilings. Plaintiff got a "wet and dry vacuum" from her garage and tried sucking up some of the water. She spent hours trying to clean up the wastewater with the vacuum and by soaking up the wastewater with towels and blankets. She cleaned the floors with vinegar and water, and she used a special cleaning solution to disinfect the bathroom.

At the time of the incident, plaintiff did not observe any buckling, warping, or other signs of water damage to the floors or walls. It did not occur to plaintiff to go under the house to see if there was any damage from water that

had gone down the heating vents. She "assum[ed] that the problem had been solved and without any obvious signs of damage to the house, * * * put the incident behind [her]."

The following winter, plaintiff noticed that her average heating bills were higher, but she did not associate that with the wastewater incident. In March 2006, she noticed that her floors had buckled and were wet to the touch. She also noticed that her paint and wallpaper was bubbling and peeling in her entryway, near a heating vent. In April 2006, she detected a sewer smell coming from her heating vents and decided to inspect the crawl space. She discovered "pockets of sewer waste and wet insulation on the vent pipes."

Throughout April and May 2006, plaintiff asked various contractors to inspect the house, and they determined that wastewater from the August incident had made its way to the furnace, which caused it to malfunction. They also determined that water had likely saturated the subflooring and was the cause of the buckling in the floors. The contractors were unable to assess the full scope of damage without an assessment by an industrial hygienist.

Beginning in May 2006, plaintiff approached the city about damage to her home. In November 2006, an insurance agent for the city informed plaintiff that her claims were being denied because she had not submitted a tort claim notice within the applicable time period. Plaintiff then filed this action in early 2007, alleging claims against the city for negligence, nuisance, trespass, and inverse condemnation.

The city moved for summary judgment on the negligence, nuisance, and trespass claims on the ground that plaintiff failed to provide notice of her claim to the city within 180 days of her injury or loss, as required by the Oregon Tort Claims Act. *See* ORS 30.275(1), (2). Plaintiff, in response, argued that the notice period did not begin to run until she discovered that her home had suffered structural damage—something that she did not realize (and, because of the latent nature of water damage, could not have realized) until March 2006, less than 180 days before she approached the city about her claim.

During the hearing on the city's motion, plaintiff explained that she had suffered different injuries as a result of the August 2005 incident. She argued,

"This Court may today say that damage to the furnace is precluded by the 180-day notice, but there's a genuine question of fact as to the structural damage, the water damage to the building materials in the house as to when those building materials started to rot, started to buckle. And water doesn't just sit stagnant, it sometimes soaks up and leaches up into walls through a wick effect. The—I mean, the loss or the injury is ongoing. There comes a point where, yes, it, you know, some of it may be barred by the torts claim notice and some of it may fall within the 180 days. But we're * * * dealing with water damage to a building, in which it is—the damage or the injury or the loss is ongoing."

The trial court rejected that argument, concluding that plaintiff knew that she was injured by the city's conduct on the day of the wastewater incident, even if she did not appreciate the full extent of the harm. The court explained:

"It's very clear that [plaintiff] was present the day the sewage came into the house and knew that the person that caused the sewage to come into the house was the City of Milwaukie. I interpret the statute to mean that that was the loss or injury date that triggered her obligation to send a written notice to the City, 'Hey, something happened. I might sue you over it.'"

Accordingly, the court granted the city's motion for summary judgment and dismissed plaintiff's negligence, nuisance, and trespass claims based on untimely notice under ORS 30.275.

## ANALYSIS

On appeal, plaintiff again argues that her notice of claim was timely based on the application of the discovery rule. That is, she contends that the trial court erred in ruling that "the 180-day period began to run when the water first entered plaintiff's home in August 2005 and not when plaintiff discovered the water damage in March and April 2006." As discussed below, plaintiff's argument is inconsistent with the well-established principle that the

notice period in ORS 30.275 begins to run when the plaintiff "knows that he or she has suffered some harm and knows that it is the result of tortious conduct," even if the plaintiff "did not know the full extent of the harm or that those facts had legal significance." *Doe v. Lake Oswego School District*, 353 Or 321, 335, 297 P3d 1287 (2013).

Under ORS 30.275(2)(b), a plaintiff cannot maintain a tort action against a public body, its officers, its employees, or its agents unless sufficient "notice of claim" is given "within 180 days after the alleged loss or injury." ORS 30.275 incorporates a "discovery rule." *See Adams v. Oregon State Police*, 289 Or 233, 239, 611 P2d 1153 (1980); *Dowers Farms v. Lake County*, 288 Or 669, 681, 607 P2d 1361 (1980). Thus, the 180-day notice period does not begin to run until the plaintiff knows or, in the exercise of reasonable care should know, of the alleged loss or injury.

For purposes of ORS 30.275, the word "injury" means "what formed the basis for an action, *i.e.*, legally cognizable harm." *Doe*, 353 Or at 328 (citation and internal quotation marks omitted). "[H]arm is legally cognizable if it is the result of tortious conduct." *Id.* Thus, for purposes of ORS 30.275, an "injury is discovered when a plaintiff knows or should have known of the existence of three elements: (1) harm; (2) causation; and (3) tortious conduct." *Id.* (citation and internal quotation marks omitted).

"[I]f a plaintiff knows that he or she has suffered some harm and knows that it is the result of tortious conduct, an argument that the plaintiff did not know the full extent of the harm or that those facts had legal significance will be of no avail." *Id.* at 335; *see Raethke v. Oregon Health Sciences Univ.*, 115 Or App 195, 198, 837 P2d 977 (1992), *rev den*, 315 Or 442 (1993) ("A cause of action for personal injury accrues from the date the injury is, or should have been, discovered, not from the time the full extent of damages is ascertained."). Thus, "a plaintiff may not avoid a statute of limitations merely by alleging different or additional injury that results from a tortious act." *Columbia County v. Sande*, 175 Or App 400, 406, 28 P3d 657 (2001). *See also Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 165, 742 P2d 1176 (1987) ("The same act or acts may cause damage to

more than one item of property at two distinct points in time. Simply splitting a claim or omitting a claim for damages to property occurring at an earlier point in time will not suffice to avoid the effect of the statute of limitations. To do so would be to mix two discrete concepts, the occurrence of harm and the extent of damages." (Citation and internal quotation marks omitted.)).

In this case, there is no genuine issue of material fact as to when plaintiff knew that she had suffered a legally cognizable harm as a result of the city's tortious conduct. It is undisputed that, on the day of the wastewater incident, plaintiff was aware that sewer water—which was gray in color, had particles floating in it, and smelled—had flooded her home and gone into her heating vents, thereby altering the present condition of her property; among other things, the wastewater required her to clean and sanitize the home, damaged personal property, and deprived her of the use and enjoyment of those areas that were underwater and covered with sewage. Plaintiff also knew, on the date of the incident, that the city's activities had caused that harm and that the harm was the result of tortious conduct (the worker "used too much pressure" when cleaning the sewer). Thus, assuming the truth of plaintiff's evidence, she was sufficiently aware of the facts giving rise to her negligence, nuisance, and trespass claims as of the date the wastewater flooded her home in August 2005.[1]

Nonetheless, plaintiff relies on two Supreme Court cases that, in her view, are consistent with running the notice period from the date that plaintiff discovered latent structural damage to her home rather than the date of the initial

---

[1] With respect to her trespass claim, plaintiff suggests that, because of the city's failure to "remove[] the remaining water and moisture, plaintiff's trespass claim is considered a 'continuing tort,'" and that every day "the temporary trespass continues, a new cause of action accrues for purposes of any applicable limitations period, including the OTCA 180-day notice period." We disagree. As we explained in *BoardMaster Corp. v. Jackson County*, 224 Or App 533, 553, 198 P3d 454 (2008), the "[f]ailure to correct allegedly negligent conduct does not turn a discrete and separately actionable act *** into a continuing tort." The fact that harm from the city's discrete conduct might "continue[] unabated, with consequent ever-increasing damages," does not create a continuing tort; "[t]hat contention confuses continuing *harm* with continuing *tortious conduct*. Although the latter may, under certain circumstances, constitute a continuing tort, the former, standing alone, cannot." *Id.* at 554 (emphasis in original).

water intrusion. The first is *Dowers Farms*, which plaintiff cites for the proposition that the notice period "begins to run when the plaintiff discovers the damage caused by the trespass and not when the trespass first occurred." *Dowers Farms* involved a claim that a county road crew's herbicide spray had damaged the plaintiff's potato crop. The court considered "whether the two year period of limitations, ORS 30.275(3), runs from the date of the incident precipitating plaintiff's injury or from the date when the plaintiff discovers the injury." *Dowers Farms*, 288 Or at 671 (footnotes omitted). The court held that ORS 30.275(3) incorporates a discovery rule, and that the limitations period ran from the date that the plaintiff discovered harm to the potatoes rather than the date of the spraying. In short, *Dowers Farms* addressed *whether* a discovery rule applies under the Oregon Tort Claims Act; it does not inform how that rule operates when, as in this case, a plaintiff was aware of harm, causation, and the public body's tortious conduct *on the date of the initial trespass.*

Second, plaintiff relies on *Schiele v. Hobart Corporation*, 284 Or 483, 587 P2d 1010 (1978), to argue that "[t]he fact that some of [plaintiff's] personal possessions were damaged in the initial water incident should not change the result." In *Schiele*, the plaintiff, a supermarket employee, had used a meat wrapping machine that was manufactured and distributed by the defendants. The machine used a hot wire to cut polyvinyl chloride meat wrapping film. Soon after beginning to use the machine in December 1972, the plaintiff began to experience a variety of health problems, including nausea, dizziness, choking, coughing, and difficulty catching her breath, and she almost immediately associated those symptoms with the fumes generated when the wire cut through the wrapping film. Her symptoms progressively worsened, and she was eventually hospitalized for pulmonary pneumonia in March 1974. In April 1974, her doctors informed her that her illness was possibly due to her exposure to polyvinyl chloride fumes on the job.

In March 1976, the plaintiff filed a complaint that alleged that "defendants' negligence caused an occupational disease." *Schiele*, 284 Or at 487. She argued that the claim was timely under the two-year statute of limitations in ORS

12.110(1) because the statute did not begin to run until she "was informed by a physician of the nature of her disease or injury and its possible cause." *Id.* The defendants argued that the statute of limitations began to run when the plaintiff became aware of her symptoms and their cause, and that she first associated her symptoms with the fumes more than two years before she filed the action. The Supreme Court disagreed with both parties' formulations of the discovery rule:

> "[W]e reject plaintiff's contention that nothing short of a positive diagnosis by a physician will [start the limitations period running]. A plaintiff whose condition has not yet been diagnosed by a physician can have or, in the exercise of reasonable care, could have access to information which requires or would require a reasonable person to conclude she is being seriously or permanently injured.
>
> "On the other hand, we reject defendants' claim that knowledge of symptoms and their causal relationship to defendants' actions in and of itself initiates the running of the statute. *We do not believe the legislature intended that the statute be applied in a manner which would require one to file an action for temporary sickness or discomfort or risk the loss of a right of action for permanent injury.*
>
> "The statute of limitations begins to run when a reasonably prudent person associates his symptoms with a serious or permanent condition and at the same time perceives the role which the defendant has played in inducing that condition. Of course, one's condition may deteriorate to the point where a delay in seeking medical attention is no longer reasonable and to further such delay would be to charge the individual with any knowledge which a medical examination would otherwise have disclosed."

*Id.* at 490 (emphasis added).

Plaintiff, citing the text emphasized above, contends that, "[l]ike the injured employee in *Schiele*," she "should not be required to file a tort claim notice for what she believed at the time was a minor inconvenience." However, that particular text in *Schiele*, as we have previously recognized, must be understood in the context of the particular injury at issue—*i.e.*, an occupational disease that resulted from repeated exposure over a period of time. *See Guiley v.*

*Hammaker*, 55 Or App 921, 926, 640 P2d 664, *rev den*, 292 Or 863 (1982) ("*Schiele* was an occupational disease case, a fact which we believe makes its apparent departure from [prior case law] more apparent than real. Occupational diseases arise out of a course of events, not out of a discrete act; it is the development and awareness of the disease, not some symptomatology, which is crucial."). This case, by contrast, involves a single incident in which plaintiff suffered immediately identifiable harm; thus, the fact that plaintiff did not know the full extent of that harm—*e.g.*, structural damage in addition to other harm from the flooding (including damage to personal property)—is not sufficient to save her claim from the running of the notice period. *See Doe*, 353 Or at 335 (for purposes of running the notice period, "an argument that the plaintiff did not know the full extent of the harm or that those facts had legal significance will be of no avail").

Regardless of whether plaintiff believed that the harm had been remedied by her cleanup efforts, the purposes of the notice requirement include allowing "the public body to investigate the claim while the evidence is still fresh and allowing the public body speedily to correct the defect, if any, out of which the claim allegedly arose." *Perez v. Bay Area Hospital*, 315 Or 474, 482, 846 P2d 405 (1993). Once plaintiff knew that she had been harmed as a result of the city's negligent conduct, she was required under ORS 30.275 to provide the city with notice of her claim, at which point the city could have investigated—and perhaps discovered sewage in the furnace or stemmed other damage before it worsened over time.

In sum, plaintiff was aware of the three elements necessary to trigger the 180-day notice period—harm, causation, and tortious conduct—as of the date of the wastewater incident in August 2005, and her notice to the city, which was provided more than 180 days later, was untimely. Thus, the trial court correctly granted the city's motion for summary judgment against those claims. We therefore remand the case to the trial court for entry of judgment consistent with the Supreme Court's holding that the city was entitled to a directed verdict on plaintiff's inverse condemnation claim.

Reversed and remanded with instructions to enter judgment in favor of the city on plaintiff's inverse condemnation claim; otherwise affirmed.